IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDREW WADSWORTH,

    Petitioner,

    v.

MATTHEW C. KRAMER, Warden,

    Respondent.

No. C-07-5241 MMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Before the Court is petitioner Andrew Wadsworth's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Respondent has filed an answer, to which petitioner has replied by filing a traverse. Having read and considered the papers filed in support of and in opposition to the petition, the Court rules as follows.

**PROCEDURAL HISTORY**

In 2004, in Alameda County Superior Court, a jury found petitioner guilty of murder in the first degree, see Cal. Pen. Code § 187(a), and found true allegations that in the commission thereof he personally used a firearm, see id. § 12022.5(a)(1), and intentionally discharged a firearm, causing great bodily injury and death, see id. § 12022.53(d). (See Ex. D (Reporter's Transcript on Appeal ("RT")) 1012.)[1] He was sentenced to a term of 50 years to life in state prison. (See Ex. A (Clerk's Transcript on Appeal ("CT")) 258.) The

---

[1] Unless otherwise noted, all references herein to exhibits are to exhibits submitted by respondent in support of the Answer.

California Court of Appeal affirmed the judgment in a reasoned opinion.  See People v. Wadsworth, No. A108087, 2006 WL 3293420 (Cal. Ct. App. Nov. 14, 2006).  On January 17, 2007, the California Supreme Court summarily denied review (see Ex. K) and, on July 11, 2007, summarily denied petitioner's petition for a writ of habeas corpus (see Ex. L).)  On October 12, 2007, petitioner filed the instant petition.

## FACTUAL BACKGROUND

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

> The victim of the homicide, Antonio Young, lived with Tyisha Danzey, the mother of his then 11-month-old daughter. . . .  So far as Danzey knew, Young was not selling drugs and she had never seen him in the possession of a holster or a gun.  Danzey testified that she and Young knew [petitioner], who was related to her cousin.  [Petitioner] and Young were "good friends" and would often "hang out" with others at a liquor store on the corner of Edes and South Elmhurst (referred to at trial as "the flatland store"), a neighborhood known as "Brookfield," in which robberies, assaults, shootings, homicides, and drug deals routinely take place.
> Danzey testified that, on the night of the killing, Young left the house telling her he planned to meet a friend called "T-Bone," who Danzey knew to be someone other than [petitioner].  Young did not appear to be upset.  Shortly after Young left, Danzey went to look for him in the area of the flatland store.  She found Young walking on the sidewalk near Clara and Ashton streets.  A person on a bike was riding next to him and the two were talking.  Young was not angry and told Danzey he would return home shortly.  Danzey did not pay attention to the bicyclist and did not know his race or whether he was [petitioner].  Danzey left somewhat upset, because she had hoped Young would return home with her.
> Oakland Police Officer Gerardo Melero testified that at 10:45 p.m. on that day he was driving south on Clara Street in an unmarked police car.  Just before he reached the intersection of Clara and Rossmoor Avenue, Melero heard three or four gunshots in rapid succession, followed two or three seconds later by a final shot.  The shots came from Rossmoor Court, which was 50 or 60 yards from the intersection of Clara and Rossmoor Avenue.  The officer drove 40 or 50 feet past the intersection and then turned around and began driving north on Clara.  He then saw [petitioner] walking quickly toward Clara on the south side of Rossmoor Avenue.  When [petitioner] turned south onto Clara, Melero shined a spotlight on him from about 20 feet away.  When [petitioner] began to run, Melero chased him on foot.  As [petitioner] ran, his right arm dropped to his waistband while his left arm continued pumping up and down.  Melero lost sight of [petitioner] but was sure he was in one of the backyards between Clara and Jones, the next street to the west of Clara.  Other officers set up a perimeter around the area and began searching the premises of the houses on Clara and Jones streets.
> Oakland Police Officer Henry Hunter was working that night in a marked car with Officer Chris Shannon.  They went to the area of the

crime after receiving Officer Melero's report of shots. The officers found Young on Rossmoor Court lying on his side between two vehicles. A bicycle was on the ground about 15 feet from the body. Examining the victim's black jacket, Hunter found what he described as a small "knife sheath," but which a technician at the scene later described as a "gun holster.". . .Officer Hunter. . . found no weapon. . . .

Dr. Thomas Rogers, the pathologist who conducted the autopsy of Young, testified he was shot five times: once in each forearm near the elbow, twice in the lower back, and once in the face at close range. . . .

[Petitioner] was apprehended in the home of Brenda Easterling, who lived on Clara Street, not far from the crime scene. . . . [Earlier that night, petitioner] knocked on her bathroom window stating that he had shot and killed Young, and asked to be let inside. [Petitioner] did not state that he acted in self-defense and acted nervously. . . . [After entering Easterling's home he] stated again that he had shot Young and, as before, did not claim he acted in self-defense. . . . [Petitioner] remained in the house for two or three hours before the police came to the door at about 12:45 a.m. while canvassing houses in the neighborhood. Easterling let the officers enter and they found [petitioner] on the couch in the den. Officer Melero arrived at the house about five minutes later and identified [petitioner] as the person he had been chasing.

One of the officers at the house, Jason Andersen, testified that [petitioner] was wearing sweatpants too small for him. A white T-shirt and white pants were next to the couch. The pants were bloodstained, and blood was also on the shoes [petitioner] was wearing. The officers found 11 loose .38 caliber bullets in a desk drawer in Tracy's bedroom. Later, after the officers then interrogating [petitioner] told Officer Andersen to go to 400 Jones Street (which was behind Easterling's house), he went there and found a .38 caliber revolver in the backyard. Five casings from fired bullets were found in the gun, and the gun was later found to be the weapon that fired the bullets recovered from Young's body. The slug found at the scene could also have been fired from the gun.

Tracy Hill, who was [petitioner's] 35-year-old cousin and knew Young, testified that she saw Young every day at the flatland store, where [petitioner] and Young regularly "hung out." On four or five occasions over a period of five or six years, Hill saw Young with a small handgun placed either in a holster on his leg or in his waistband. Hill admitted she had been convicted of selling cocaine, stealing from stores, assaulting a police officer and prostitution.

. . .
At trial, [petitioner] took the stand and admitted four prior arrests for trespassing, drinking, selling crack cocaine, and exhibiting a firearm. . . .
. . .
[Petitioner] said that on the night of the killing he left his house with his loaded revolver at about 10:00 p.m. He ran into Young at the corner of Clara and Edes and Young told him he (Young) was "dirty," which [petitioner] took to mean that he was carrying something illegal, such as drugs or a gun. [Petitioner] did not tell Officers Rullamas and Nolan [at his interview following his arrest] that Young had a gun because it was only "after everything happened [that] I realized it was a gun." . . . At the time he started riding his bicycle alongside Young, [petitioner] had no reason to think Young wanted to hurt him, as Young had never sought to hurt him in the past. However, about a year or a year-and-a-half prior to the shooting, Young confronted [petitioner] near the Oakland Library. He told

3

> [petitioner] he did not trust him because he lived on Clara Street. . . . [Petitioner] had on other occasions been told by Young of instances in which he shot people, on one of which "he blew somebody's head off."
>     [Petitioner] stated that just prior to the killing, Young displayed a gun and said " 'I heard you and your uncle were out to kill me.' " Young then put the gun back in his pocket, indicating to [petitioner] that he was considering whether to use it. [Petitioner] was not sure what Young was thinking, but once Young showed his weapon and mentioned [petitioner's] uncle he "knew it was business right then ." A few seconds after Young put his gun in his pocket, [petitioner] saw "he was coming back out with it" and immediately drew his own gun and shot Young in the face at close range. [Petitioner] said he did not actually see Young pull the gun out again before he shot, stating, "I didn't give him a chance, to be honest with you." [Petitioner] was unable to say whether Young had a gun in his hand at the time he shot him. [Petitioner] was also unable to recall whether Young was on the ground when he shot him in the back, but he did remember shooting Young numerous times. [Petitioner] acknowledged having considered the possibility Young might retaliate if he lived, agreeing that such thoughts are "part of my lifestyle and "I'm not ready to go." Asked whether he felt "justified" in killing Young, appellant responded: "I can't say I had the right to kill him, but all I'm trying to say, I didn't just—I didn't want to kill him, let me put it like that. I can't say that it is the right thing to do, but that was—that was the only thing I could think of at the time, to be honest."

Wadsworth, 2006 WL 3293420, at *1-5.

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." See

1 Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal quotation and citation omitted).

2       A state court decision is "contrary to" clearly established Supreme Court 3 precedent if it "applies a rule that contradicts the governing law set forth in [the 4 Supreme Court's] cases" or if it "confronts a set of facts that are materially 5 indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a 6 result different from [its] precedent." See Williams, 529 U.S. at 405-06. "Under the 7 'unreasonable application' clause, a federal habeas court may grant the writ if the state 8 court identifies the correct governing legal principle from [the Supreme] Court's decision 9 but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. 10 "[A] federal habeas court may not issue the writ simply because that court concludes in 11 its independent judgment that the relevant state-court decision applied clearly 12 established federal law erroneously or incorrectly. Rather, that application must also be 13 unreasonable." Id. at 411.

14       The decision implicated by § 2254(d) is the "last reasoned decision" of the state 15 court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 16 F.3d 1085, 1091-92 (9th Cir. 2005). Consequently, to the extent petitioner's claims 17 were addressed on direct review, this Court "looks through" the California Supreme 18 Court's summary denial of the petition for review to the Court of Appeal's reasoned 19 opinion. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing 20 Nunnemaker, 501 U.S. at 803-04). As to petitioner's claims for which there is no 21 reasoned opinion available, specifically, those raised for the first time by way of state 22 habeas corpus and summarily denied, the United States Supreme Court has recently 23 clarified that a federal habeas court, in applying the review provisions of 28 U.S.C. 24 § 2254(d), looks to the result reached by the highest state court, and that the absence 25 of reasoning does not prevent application of the standard of review set forth in § 26 2254(d). See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

27 //

28 //

5

**DISCUSSION**

Petitioner claims: (1) a violation of his right to effective assistance of counsel, by his attorney's (a) failure to request a jury instruction on manslaughter based on heat of passion, (b) failure to investigate a potential heat of passion defense, and (c) failure to investigate other witnesses who could have corroborated petitioner's testimony that Young had previously shot people; (2) a violation of petitioner's due process rights, his right to produce witnesses, and his right to effective assistance of counsel, based on the trial court's limiting the admissibility of certain out-of-court statements by Young and his attorney's agreement with said ruling; and (3) a violation of petitioner's due process rights, based on the trial court's admission of prior acts of misconduct to impeach petitioner and defense witness Tracy Hill.[2] The Court considers each claim in turn.

**A.    Ineffective Assistance of Counsel**[3]

A claim of ineffective assistance of counsel is cognizable as a denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, petitioner must establish two elements. First, he must establish his counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under "prevailing professional norms." Id. at 687-88. Second, he must establish he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

---

[2] With the exception of his two claims of ineffective assistance based on failure to investigate, which were raised only in his state habeas petition, petitioner raised each of the above claims in both his direct appeal and by his petition.

[3] The Court addresses in this section three of petitioner's four claims alleging ineffective assistance. The fourth such claim is addressed in the section immediately following.

Under Strickland's "highly deferential" standard, a court considering a claim of ineffective assistance "must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Harrington, 131 S. Ct. at 787-88. (internal quotations and citations omitted). Further, where, as here, § 2254(d) applies, a petitioner's burden is even greater. "The question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 788.

### 1. Failure to Request Jury Instruction

Petitioner claims his attorney, Brian Hong ("Hong") provided ineffective assistance by not requesting "heat of passion manslaughter instructions despite there being substantial evidence of sufficient provocation." (See Pet. at 12:2-3.) The Court of Appeal rejected this claim, reasoning that "even if there was substantial evidence of provocation, the relevant evidence demonstrate[d] that it did not arouse [petitioner's] anger or any emotional outrage," and, consequently, "defense counsel had no adequate basis upon which to request the court to instruct on heat of passion." See Wadsworth, 2006 WL 3293420, at *8.

Even assuming, arguendo, the record would have supported a manslaughter instruction based on heat of passion, petitioner fails to show counsel's decision not to request such an instruction constituted ineffective assistance. Petitioner's defense, as noted, was reasonable self-defense, which constituted a complete defense to the charges. The jury was fully instructed on that defense. (RT 992-95; CT 185.) Additionally, as an alternative, counsel requested and the trial court gave instructions on the lesser offense of manslaughter based on imperfect self-defense. (RT 999-1000; CT 186.) Although manslaughter based on a theory of imperfect self-defense and manslaughter based on a theory of heat of passion are not, as a legal matter, mutually exclusive, see People v. Breverman, 19 Cal.4th 142, 152-53 (1998), the latter theory, with its emphasis on a lack of rational thought, could well have been perceived by defense counsel as undermining not only the former theory but also the complete

1 defense of reasonable self-defense, and in light of such potentially damaging effect, not
2 requested. Such a tactical decision cannot be deemed deficient performance. See
3 Massaro v. United States, 538 U.S. 500, 505 (2003) (holding defendant alleging
4 ineffective assistance of counsel has burden to show "counsel's actions were not
5 supported by a reasonable strategy"); Strickland, 466 U.S. at 689-90 (noting 'there are
6 countless ways to provide effective assistance in any given case").

7 Moreover, petitioner's claim fails for the additional reason that petitioner fails to
8 show he was prejudiced by counsel's failure to request the instruction he claims should
9 have been given. The jury was instructed that murder in the first degree based on
10 deliberation and premeditation requires a "clear, deliberate intent . . . to kill, which was
11 the result of deliberation and premeditation, so that it must have been formed upon pre-
12 existing reflection and not under a sudden heat of passion or other condition precluding
13 the idea of murder " (RT 997:8-10), that "a mere unconsidered and rash impulse, even
14 though it includes an intent to kill, is not deliberation and premeditation" (RT 997:23-25),
15 and that "[t]o constitute a deliberate and premeditated killing, the slayer must weigh and
16 consider the question of killing and the reasons for and against such a choice" (RT
17 997:27-998:2) (emphasis added). The jury was further instructed that if "the evidence[]
18 establishes that there was provocation which played a part in inducing an unlawful
19 killing of a human being, . . . you should consider the provocation for the bearing it may
20 have on whether the defendant killed with or without premeditation and deliberation."
21 (RT 1001:16-22) (emphasis added).)

22 In light of such instructions, as well as the instructions given on both versions of
23 self-defense, the jury's verdict of murder in the first degree, as opposed to murder in the
24 second degree or manslaughter based on imperfect self-defense, demonstrates the jury
25 did not accept petitioner's testimony that he acted either rashly or upon provocation.
26 See People v. Wharton, 53 Cal. 3d 522, 572 (1991) (finding first degree murder based
27 on theory of deliberation and premeditation "manifestly inconsistent with having acted
28

under the heat of passion").[4]

Accordingly, the Court of Appeal's determination was not an objectively unreasonable application of Strickland, and petitioner is not entitled to habeas relief on this claim.[5]

## 2. Failure to Request Instruction/Investigate Defense

Petitioner claims his attorney "failed to adequately investigate the defense of heat of passion voluntary manslaughter" (see Pet. at 13:16-19) and, as a consequence, "never developed the information" (id. at 16:3-8). In support thereof, petitioner has submitted a declaration in which he states he was "enraged and acting in the heat of passion when [he] shot Antonio Young" and that "Hong never asked [him] if [he] was enraged or in the heat of passion when [he] shot Antonio Young." (See Wadsworth Decl. (attached as exhibit to Petition).) Petitioner's claim fares no better with such expansion of the record.

First, the declaration is notable as much for what it doesn't say as for what it does say. In particular, petitioner does not say Hong never discussed with him how he was feeling or what was going through his mind at the time of the shooting and surrounding events; indeed, petitioner never states he didn't tell Hong he was angry.

Second, as explained by petitioner in his declaration, "the reason [he] was

---

[4] As the Court of Appeal observed, petitioner made a number of "conflicting statements," see Wadsworth, 2006 WL 3293420, at *3, concerning whether and when Young displayed a gun, and as to other circumstances as well, see id. at *2-5 (describing petitioner's statements to police and testimony at trial). Also, although petitioner testified that he was "just trying to stop [Young]" and fired all the shots "as fast as [he] could" without pausing (RT 794-95), from a distance of more than two feet, with the first shot being to Young's face (RT 774), the prosecution's theory was that Young was on the ground and was shot in the head execution style (RT 215, 971-72), based on evidence that the last shot was fired after a lapse of time (RT 297), that Young was taller than petitioner (RT 743) yet the bullet that entered Young's eye traveled to his jaw in a downward trajectory (RT 237), and that, according to the coroner, it was fired from a distance of "less than one inch" (RT 253).

[5] To the extent petitioner, in his petition to the California Supreme Court, expanded this claim to include issues not raised by the record before the Court of Appeal, those issues are addressed below in connection with petitioner's claim that counsel failed to investigate and develop a heat of passion defense.

9

1 enraged and acting in the heat of passion was that Antonio Young had displayed a
2 firearm to [him], and had made an implied threat to [him] seconds before [he] shot him."
3 (See id.) Hong was well aware of petitioner's account of the events surrounding the
4 shooting, both from petitioner's statements to the police and his testimony, and thus had
5 all the information he needed to request a heat of passion manslaughter instruction
6 based on fear engendered such perceived threat, had he felt it was to petitioner's
7 advantage to do so.[6] As discussed above, Hong's determination not to seek such an
8 instruction falls within the range of reasonable tactical decisions.

9 Although, as petitioner points out, a strategic decision based on an unreasonable
10 failure to investigate is not entitled to deference, see, e.g., Williams v. Taylor, 529 U.S.
11 362, 395-96 (2000) (finding ineffective assistance in death penalty case, where trial
12 counsel's decision not to investigate or present mitigating evidence of defendant's
13 abusive childhood was based on unreasonable misunderstanding that state law barred
14 access to childhood records), petitioner fails to show he was prejudiced by the failure to
15 investigate claimed here.

16 In particular, even if Hong failed to make an inquiry of petitioner that ordinarily
17 would have called for petitioner's describing his emotional state, a failure petitioner, as
18 noted, has not asserted, and even if petitioner would have stated in response thereto
19 that he not only was acting out of fear but also was "enraged," there is no indication that
20 Hong would have, or should have, changed his tactical decision not to request an
21 instruction based on heat of passion. As noted above, an emphasis on passion, let
22 alone rage, could well have been seen as undermining petitioner's defense that he was
23 acting reasonably in self-defense, which defense, if accepted, entitled petitioner to an
24 acquittal. To introduce rage into the equation had the even greater potential of
25 undermining that complete defense, as well petitioner's alternative defense of imperfect

---

[6] At the time of petitioner's trial the law was well established that a "threat and fear of harm" could support manslaughter based on heat of passion. See Breverman, 19 Cal.4th at 152-53; CALJIC 8.44 (identifying "fear" among emotional states that "may be involved" in heat of passion).

10

1 self-defense, which requires a good faith belief in the need to defend oneself, a state of
2 mind not ordinarily associated with rage.
3 Lastly, in light of the jury's findings as discussed above, petitioner has not shown
4 the result of the trial would have been different had such an instruction been requested
5 and given.
6 Accordingly, petitioner is not entitled to habeas relief on this claim.

### 3. Failure to Investigate Corroborating Witnesses

Petitioner claims he did not receive effective assistance of counsel because Hong "failed to investigate other witnesses who could have corroborated" petitioner's testimony that Young had shot persons in the past. (See Pet. at 21:3-20.) In support thereof, petitioner relies on the above-referenced declaration, in which he states Hong "never asked [him] about how he could locate any witnesses that Antonio Young had shot other persons prior to August 16, 2001," and that "[a]s far as [petitioner] know[s,] Hong made no effort to investigate whether Antonio Young had shot other persons prior to August 16, 2001." (See Wadsworth Decl.) (emphasis added).)

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. Here, even assuming Young failed to conduct an adequate investigation with respect to locating any such witnesses, petitioner's claim nonetheless fails, for the reason that petitioner fails to show he was prejudiced thereby. In particular, petitioner fails to show any such witnesses actually existed, let alone that they would have been willing to cooperate with the defense. See Dows v. Wood, 211 F.3d 480, 486-87 (9th Cir. 2000) (finding petitioner failed to establish claim of ineffective assistance where "there [was] no evidence in the record that [the] witness actually exist[ed]" and petitioner "ha[d] not presented an affidavit from the alleged witness").

Accordingly, petitioner is not entitled to habeas relief on this claim.

### B. Limiting Instruction as to Out-of-Court Statements

Petitioner claims his constitutional rights were violated by the trial court's ruling

11

1 limiting the admissability of petitioner's testimony concerning out-of-court statements
2 made by Young. In particular, the court admitted petitioner's testimony recounting the
3 statements, but did so for the limited purpose of showing "'the statements were made
4 and this information was imparted to [petitioner].'" See Wadsworth, 2006 WL 3293420,
5 at *8 (quoting trial court's admonition to jury).[7] In other words, the statements were
6 admitted not for the truth of the matters contained therein but for the purpose of showing
7 petitioner's state of mind. Defense counsel agreed with the limitation, see id., which
8 agreement, petitioner claims, constituted ineffective assistance.

      The Court of Appeal found the testimony was not sufficiently reliable to be admitted as a statement against penal interest and that, in any event, the truth of Young's statements was not relevant to petitioner's theory of defense. See id. (noting "all that was necessary for [petitioner] to prevail on [a theory of self-defense] was for the jury to conclude that [petitioner] believed the statements").

      Citing Chambers v. Mississippi, 410 U.S. 284 (1973), petitioner contends the statements should have been admitted for the truth of the matters asserted therein and that the trial court's limiting instruction violated his constitutional right to due process.[8] Petitioner's reliance on Chambers is unavailing, as that case is markedly distinguishable on its facts. In Chambers, the Supreme Court found a due process violation where the trial court had excluded testimony from three separate defense witnesses that another individual had, on four separate occasions, confessed to the murder with which the petitioner therein was charged, where the confessions "bore persuasive assurances of trustworthiness" and were "critical to [the] defense," and

---

[7] Although petitioner describes the trial court's ruling as an "exclusion" (see Pet. at 19:14-17), the out-of-court statements were in fact admitted, albeit for such limited purpose.

[8] Petitioner also argues the trial court incorrectly applied California evidence law. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," however. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").

where, the trial court, when the individual was called as a witness by the defense, had refused to allow the petitioner to cross-examine him as an adverse witness. See id. at 288, 300-03. The facts and circumstances here differ considerably from those presented in Chambers.

First, the statements petitioner attributes to Young lack the assurances of trustworthiness possessed by the confessions in Chambers. See Chambers, 410 U.S. at 300-01 (noting confessions were made spontaneously and shortly after incident, were clearly against the declarant's penal interest and were corroborated by other evidence, and declarant was available for questioning at trial); see also, e.g., U.S. v. Paguio, 114 F.3d 928, 931-35 (9th Cir. 1997) (holding, where defendant was convicted of making false loan application, exclusion of defendant's father's statement inculpating father and exonerating defendant violated due process; noting "loan officer, escrow agent, and accountant all corroborated the proposition that the father and not the son managed the entire transaction").

Second, the truth of the matters asserted in the statements was not critical to the defense, nor would their introduction without limitation have served to exonerate petitioner, who, as discussed above, admitted to killing Young. Rather, as the Court of Appeal found, what was critical to the defense was that petitioner believed the statements to be true and, as a result, feared for his life.

Moreover, given the lack of corroboration and trustworthiness, there is little likelihood the introduction of the statements without limitation would have altered the result reached by the jury. See Montana v. Egelhoff, 518 U.S. 37, 53 (1996) (noting Chambers does not hold that "a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded").

As noted, petitioner also claims his attorney was deficient in acceding to the limitation. For the reasons set forth above, there is no showing an objection to the limitation would have changed the trial court's ruling. See Matylinsky v. Budge, 577

1 F.3d 1083, 1093-94 (9th Cir. 2009) (holding trial counsel's failure to object to testimony
2 not deficient where objection would have been properly overruled), cert. denied, 130 S.
3 Ct. 1154 (2010). Further, as noted, there is no showing a different ruling would have
4 affected the outcome of the trial, and, consequently, petitioner fails to show he suffered
5 any prejudice by reason of such claimed ineffective assistance.

6 Accordingly, the Court of Appeal was not unreasonable in its determination and
7 petitioner is not entitled to habeas relief on this claim.

### C. Evidence of Prior Misconduct to Impeach Petitioner and Hill

9 The trial court admitted, for purposes of impeachment, evidence of prior unlawful
10 conduct by petitioner and defense witness Tracy Hill ("Hill"). See Wadsworth, 2006 WL
11 3293420, at *9. In particular, petitioner was asked whether he had sold drugs and
12 whether he had brandished a weapon in a confrontation with a store clerk; he admitted
13 selling drugs to support himself and the confrontation but denied any brandishing (RT
14 721-223, 726); Hill was asked about and testified she had committed and been
15 convicted of selling drugs, assault on a police officer, thefts from stores on two
16 occasions, and prostitution (RT 708-09, 711).

17 Petitioner claims the introduction of such evidence violated his right to due
18 process See id. The Court of Appeal denied the claim, finding the evidence was
19 properly admitted under state law. See id.; see also People v. Wheeler, 4 Cal.4th 284,
20 290-93 (1992) (holding, in criminal proceedings, for purposes of impeachment, Cal.
21 Const., art. I, § 28(d) supersedes all California restrictions on admission of relevant
22 evidence, other than certain specified restrictions such as privilege and hearsay);
23 People v. Lee, 28 Cal.App. 4th 1724, 1738-39 (1994) (holding, under § 28(d), "trial
24 courts may, in their discretion, admit conduct showing dishonesty or moral turpitude for
25 impeachment").

26 The admission of evidence violates due process only if the introduction of such
27 evidence renders the trial fundamentally unfair. See Estelle v. McGuire, 502 U.S. 62,
28 67-68, 69 (1991) (citing Spencer v. Texas, 385 U.S. 554, 563-64 (1967). Evidence of

14

other acts violates due process only if no permissible inference may be drawn from it. Leavitt v. Agrave, 383 F.3d 809, 829 (9th Cir. 2004). A permissible inference as to a witness's credibility may be drawn from conduct involving moral turpitude and/or lack of honesty. See id. The Court of Appeal's determination that the conduct here was of such character cannot be deemed an unreasonable application of clearly established federal law.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### D. Cumulative Effect

In his reply, petitioner argues the "cumulative effect of the trial court's evidentiary errors" deprived petitioner of his right to due process. (See Reply at 24:78); Chambers, 410 U.S. at 298, 302-03 (recognizing prejudice resulting from cumulative error). As discussed above, however, petitioner has failed to demonstrate any evidentiary error was committed by the trial court. Moreover, even if one were to assume each of the challenged rulings constituted error, petitioner fails to show such errors worked in combination to deny him a fair trial, as they were in no manner related and thus lacked any greater impact when considered in combination.

Accordingly, petitioner fails to show he is entitled to habeas relief based on his claim of cumulative error.

### E. Certificate of Appealability

A certificate of appealability will be denied with respect to petitioner's claims. See 28 U.S.C. § 2253(c)(1)(a); Rules Governing Habeas Corpus Cases Under § 2254, Rule 11 (requiring district court to issue or deny certificate of appealability when entering final order adverse to petitioner). Specifically, petitioner has neither made "a substantial showing of the denial of a constitutional right," Hayward v. Marshall, 603 F.3d 546, 554-55 (9th Cir. 2010) (en banc) (citing 28 U.S.C. § 2253(c)(2)), nor demonstrated his claims are "debatable among reasonable jurists." Id. at 555.

//

//

**CONCLUSION**

For the reasons set forth above:

1. The petition for a writ of habeas corpus is hereby DENIED.

2. A certificate of appealability is hereby DENIED.

**IT IS SO ORDERED.**

Dated: February 10, 2012

MAXINE M. CHESNEY
United States District Judge